UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
CHRIS ROCCO,

                Plaintiff,

      - against -

LONG ISLAND RAILROAD,

                Defendant.
------------------------------------------------------X

**MEMORANDUM
AND     ORDER**

01 CV 594 (CLP)

On February 1, 2001, plaintiff Chris Rocco ("Rocco"), formerly employed by the Long Island Railroad ("LIRR"), commenced this action seeking damages for injuries suffered while he was operating a forklift during the course of his employment at the LIRR. A trial was held before the undersigned pursuant to the consent of the parties and, despite the LIRR's admission of negligence, the jury returned a verdict in favor of defendant, finding that plaintiff had failed to prove by a preponderance of evidence that "he was in fact injured as a result of the incident that took place on August 26, 2000." (Verdict Sheet, Question 1).

Plaintiff now moves to set aside the verdict and for a new trial on the grounds that the expert testimony and other evidence presented at trial demonstrates that plaintiff sustained injury as a result of the forklift accident and he was therefore entitled to judgment in his favor.

TRIAL TESTIMONY

A. Plaintiff's Testimony

On August 26, 2000, plaintiff Rocco was operating an Otis forklift or "hi-lo" while

working at the Richmond Hill facility of the LIRR. (12/9/03 Tr. at 3-5).[1] As he drove over a metal plate used to cover an access hatch in the floor of the facility, the plate buckled, causing one of the wheels of the forklift to drop into the hole. (Id. at 9-10, 147-48). Tommy McGregor, gang foreman and Rocco's supervisor, described the depth of the hole in which the wheel of the forklift fell as approximately five inches. (Id. at 4, 148).

Plaintiff testified that the force and abruptness of the drop jarred him first downward with "tremendous force" and then forward, causing him to hit his head on the steering wheel. (12/9/03 Tr. at 9-10). He was then thrown backward into his seat. (Id. at 10). A fellow employee, John Alvez, lifted Rocco off the forklift and laid him on a pallet. (Id. at 11). Although plaintiff complained to his foreman of stiffness, numbness and nausea immediately after the accident, he refused medical attention and declined to have an ambulance take him to the hospital. (Id. at 14, 15). Instead, after nearly one hour, plaintiff drove himself to the LIRR Medical Department in Mineola. (Id. at 15). There, he was examined by a physician's assistant, Ms. Colasanti, who noted that plaintiff was in distress, had problems walking and sitting and was tender to palpation in the lower thoracic and lumbarsacrum area. (Def.'s Ex. D, Part 1).[2] At the time of this visit, plaintiff denied any history of prior low back pain or neck injury, and denied

---

[1] Citations to "Tr. at," preceded by a date, refer to pages in the transcripts of the trial proceedings before this Court, beginning on December 8, 2003. Citations to "Pl.'s Ex." refer to exhibits introduced at trial by plaintiff. Citations to "Def.'s Ex." refer to defendant's trial exhibits.

[2] The Court notes that Defendant's Exhibit D was submitted in two parts, referred to hereafter as "Part 1" or "Part 2."

that he was on any medication. (Id.; see also 12/15/03 Tr. at 5).[3] Plaintiff was advised at that time to consult his own physician. (12/9/03 Tr. at 17). He left the medical facility and drove another twenty minutes to his home. (Id.)

Later that same day, plaintiff's father drove plaintiff to see Dr. Luigi Capobianco, who had been plaintiff's primary care physician from 1989 to the date of the trial. (Id. at 18; 12/11/03 Tr. at 127). Dr. Capobianco examined plaintiff and found him to have some "paracervical spine tenderness" and "marked paralumbosacral spasm" and tenderness. (12/11/03 Tr. at 131). Dr. Capobianco's impression at the time was of a possible herniated disk and c-spine strain in the cervical and lower spinal regions. (Id. at 133). The doctor recommended physical therapy for plaintiff and prescribed Vioxx. (12/12/03 Tr. at 7).

Several days later, on August 28, 2000,[4] plaintiff returned to Dr. Capobianco's office with continuing complaints of muscle spasm, pain and discomfort in his middle and lower back. (12/9/03 Tr. at 21-22; see also 12/11/03 Tr. at 133-34). At that second visit, plaintiff complained about increased neck pain, an ache down to his shoulders and his back, and pain on his right side down to his hip and right buttock. (12/11/03 Tr. at 134). The doctor prescribed a trial of Percocet. (Id.) Dr. Capobianco also directed Rocco to the emergency room at North Shore University Hospital in Glen Cove ("Glen Cove Hospital" or the "Hospital"). (12/9/03 Tr. at 22-

_____

[3]The following day, according to Ms. Colasanti, Mr. Rocco called to tell her that he had had a prior injury approximately a week before, doing yard work. (12/15/03 Tr. at 5; Def.'s Ex. D, Part 1). Moreover, although plaintiff did not disclose this to Ms. Colasanti, Mr. Rocco had been prescribed and was taking medication prior to the time of the accident, specifically, Prozac and Valium for anxiety. (12/11/03 Tr. at 132).

[4]Dr. Capobianco's testified that the date of Rocco's second visit was on August 28, 2000. (12/11/03 Tr. at 133). However, the Hospital records indicate that Rocco was seen and x-rayed on August 29, 2000. (Pl.'s Ex. 2; 12/9/03 Tr. at 23).

24). At the Hospital, x-rays of plaintiff's lumbar and thoracic spine were taken. (Pl.'s Ex. 2). These x-rays showed only some disk space narrowing at L5-S1 and T12-L1. (Id.) There was no evidence of "spasm" seen by the Hospital staff on this occasion and Mr. Rocco was diagnosed with cervical and lumbar strain. (Id.) Plaintiff was told to continue with the medication prescribed by Dr. Capobianco. (Id.) [5]

On September 6, 2000, plaintiff returned to Dr. Capobianco's office for a follow up visit. (12/11/03 Tr. at 135-36). At the time, Dr. Capobianco noted that plaintiff had marked reduction of cervical motion, diminished reflexes and evidence of radiculopathy. (Id.) He continued plaintiff on the Percocet and ordered continued physical therapy. (Id. at 137).

On September 12, 2000, plaintiff went to the emergency room at Glen Cove Hospital, complaining of pain. (12/12/03 Tr. at 42-44). There the examining physician noted that plaintiff had full range of motion, but nevertheless gave him 75 milligrams of Demerol intravenously. (Id.) Dr. Capobianco noted that this was "a lot of pain medicine for someone who just has tenderness." (Id. at 44).

Mr. Rocco continued to consult with Dr. Capobianco, who eventually recommended that Rocco see an orthopedic spine surgeon, Dr. Vincent Leone. (Id. at 138; 12/9/03 Tr. at 27). Mr. Rocco saw Dr. Leone in the middle of September 2000. (12/9/03 Tr. at 27-28). Dr. Leone's records of the September 13, 2000 visit record an impression of "[c]ervical and lumbar sprains, rule out cervical and lumbar posttraumatic herniated disc." (12/12/03 Tr. at 50-51; Def.'s Ex. S).

---

[5]Although plaintiff testified that he received an injection on this occasion (12/9/03 Tr. at 25), the Hospital records do not confirm that an injection was in fact given during the August 2000 visit. (Pl.'s Ex. 2).

4

Dr. Leone referred Mr. Rocco for physical therapy and also prescribed an anti-inflammatory drug, either Vioxx or Celebrex, which Mr. Rocco took only for a few days because it made him nauseous. (12/9/03 Tr. at 28-29). The doctor also sent plaintiff for additional MRIs, which were performed, along with a CT scan, which was performed on September 15, 2000, revealing disk degeneration at L4-L5 and L5-S1, with spondylosis in the lumbar region, and multi-level disk degeneration in the cervical spine. (Def.'s Ex. Q). There was, however, no evidence of any herniations in the neck or lower back. (12/12/03 Tr. at 53-54; Def.'s Ex. S; but see 12/11/05 Tr. at 127 (noting "a small herniation or bulge at the lower back" found in the MRI done in mid-September 2000)). Nor were there any fractures shown on either of the MRIs taken in mid September or on the earlier x-rays taken shortly after the accident in August 2000. (12/12/03 Tr. at 19-20). When Dr. Capobianco saw plaintiff on September 16, 2000, the doctor was concerned because "the MRI showed limited pathology, but yet he [plaintiff] was having more physical clinical pathology that didn't correspond to the MRI." (12/11/03 Tr. at 137).[6] The doctor changed plaintiff's medication to Oxycontin, a form of morphine, but prescribed a small dose for him. (Id. at 138).

On September 21, 2000, plaintiff returned to the emergency room at Glen Cove Hospital, where he received another shot of Demerol and Vistaril. (12/12/03 Tr. at 58-59). On that occasion, he told the nurse that he had "bulging vertebra," even though he had been told that the MRIs had been negative. (12/12/03 Tr. at 60-61).

---

[6] The parties dispute whether there was in fact a herniation or bulge shown on these MRIs. (See discussion infra at 26 n.18; see also 12/11/03 Tr. at 137; 12/12/03 Tr. at 24-29, 38-39).

Approximately two weeks later, on September 30, 2000, Dr. Capobianco examined plaintiff again and determined that there was tenderness in his mid-spine which suggested a disk problem. (12/11/03 Tr. at 138-39). The doctor testified that this type of problem could be the result of an inflammatory process, a cancer, a tumor, an infection, or a fracture. (Id. at 140).

In September 2000, plaintiff began physical therapy with Stephen Pantell at Island Fitness Sports Medicine. (12/9/03 Tr. at 30). Plaintiff testified that although Dr. Leone had recommended physical therapy three to four times a week, the LIRR had only authorized two sessions per week. (Id. at 30). On October 16, 2000, Dr. Leone prescribed a T.E.N.S. unit for plaintiff, which is an apparatus that "imparts electrical stimulation to groups of muscles. . . ." (12/12/03 Tr. at 34).

On October 19, 2000, plaintiff was taken by ambulance to Glen Cove Hospital. (12/9/03 Tr. at 38, 39; 12/12/03 Tr. at 62; Pl.'s Ex. 6). Plaintiff initially testified that he was lying on the floor with the T.E.N.S. unit on, and discovered that he was unable to get up off the floor. (12/9/03 Tr. at 38). However, the Hospital records reflect that plaintiff had told the emergency room staff that he had injured himself in a fall, when his right leg gave out after getting out of bed. (Pl.'s Ex. 6; 12/9/03 Tr. at 183, 187-88). Plaintiff spent several days in the Hospital, from October 19 through October 23, 2000, where he was treated with intravenous pain medication. (12/9/03 Tr. at 40-41). After he was released from the Hospital, plaintiff remained under the care of Dr. Capobianco and Dr. Leone. (Id. at 42).

At the Hospital, a CT scan and x-rays were ordered, which disclosed compression type fractures of three thoracic vertebrae. (12/12/03 Tr. at 171-72; 12/9/03 at 40; Pl.'s Ex. 6). Dr. Capobianco testified on cross-examination, that the x-rays taken on August 29, 2000, three days

6

after the accident, did not show that there were any fractures present, though the x-rays did show some narrowing of the disk spaces with "[n]o fracture/disk location noted." (12/12/03 Tr. at 19-20). Dr. Capobianco conceded that the narrowing of the disk space could be due to degenerative disk disease which takes "months if not years to occur." (Id. at 26). Indeed, he conceded that the CT scan taken on September 15, 2000 showed multi-level disk degeneration. (Id. at 25) Similarly, the MRIs taken on September 15, 2000, showed disk dessication, which the doctor testified is evidence of degenerative disk disease, that had been ongoing for a while. (Id. at 31). Although the doctor conceded that this disk degeneration is "usually a long-standing condition" (id. at 26), he indicated that he could not determine if the narrowing of the disk space was something that started at the time of the accident, three days earlier. (Id. at 20-22). He conceded, however, that he was not an orthopedic surgeon or neurosurgeon and this was outside his area of specialty. (Id. at 32).

Following the October 19, 2000 hospitalization, Dr. Leone ordered a torso brace which extended from the top of plaintiff's chest down to his pelvis. (12/9/03 Tr. at 42-43). According to Dr. Capobianco, the purpose of the brace is to immobilize the body while the fractures heal. (12/11/03 Tr. at 68). Plaintiff also discontinued physical therapy with Mr. Pantell. (Id. at 114). Toward the end of December 2000, the LIRR's physical therapist issued crutches to Mr. Rocco when he began experiencing weakness in his legs, particularly his right leg. (12/9/03 Tr. at 45). He continued to take Percodan and muscle relaxers for the pain. (Id. at 46).

Dr. Capobianco testified that he saw Mr. Rocco on a number of occasions over the next three years. (12/11/03 Tr. at 147). He made a number of alterations in plaintiff's medications and described plaintiff as "a frequent flyer to the emergency room" where he would go to get

7

Demerol shots. (Id. at 148). At one point, plaintiff contacted Dr. Capobianco and requested hydrocodone for a cough. (12/12/03 Tr. at 80). Dr. Capobianco instructed his staff to be careful about the other medication being given to plaintiff. (Id. at 80-81). The doctor noted his concern "with the [plaintiff's] usage of medication" and even gave the medication to plaintiff's father to dispense to plaintiff at one point. (Id. at 149-151). Although he referred plaintiff to Dr. Leone, Dr. Capobianco testified that plaintiff "sought the advice of other physicians, and that was one of my difficult parts with Mr. Rocco, I was trying to corral him and make sure he wasn't going to every Tom, Dick and Harry in the medical profession. I had some concerns there." (Id. at 147). According to Dr. Capobianco, plaintiff was "doctor shopping." (Id. at 161).

In April and again in June 2001, Rocco went to see Dr. Frank Cammisa and Dr. Federico Girardi at the Hospital for Special Surgery.[7] (12/9/03 Tr. at 48). Dr. Girardi's opinion was that "we have nothing to offer the patient from a surgical standpoint as it is difficult to pinpoint where his pain is coming from." (12/12/03 at 72; see also Def.'s Ex. T). Plaintiff, however, testified that in early 2001, he stopped seeing Dr. Leone, and was referred by Dr. Capobianco to another orthopedic surgeon, Dr. Joseph Lopez.[8] (12/9/03 Tr. at 47-48). Dr. Lopez sent plaintiff for another CT scan to confirm the fractures, but surgery was not recommended at that time. (Id. at

---

[7]Plaintiff testified that the LIRR sent him to see Dr. Girardi at the Hospital for Special Surgery. (12/9/03 Tr. at 48-49).

[8]While plaintiff testified that Dr. Capobianco referred him to Dr. Lopez (12/9/03 Tr. at 47-48), it was Dr. Noel Perin, not Dr. Capobianco, who testified to referring plaintiff to Dr. Lopez. (12/10/03 Tr. at 152). Plaintiff was referred to Dr. Perin by Dr. Michael Overby. (Id. at 128, 131). It is unclear who, if anyone, referred Mr. Rocco to Dr. Overby. Dr. Capobianco denied doing so. (12/12/03 Tr. at 73-74; but see Def.'s Ex. I). Dr. Overby saw plaintiff on January 10, 2002 and noted "no true thoracic radiculopathy," which Dr. Capobianco explained meant that the doctor could not determine if there was a radiating pain across the chest as plaintiff claimed. (12/12/03 Tr. at 75).

47-48).

Dr. Girardi eventually referred plaintiff to a neurologist, Dr. Dexter Sun, who wanted to perform a nerve conduction study. (Id. at 53). However, according to plaintiff, the test was never conducted because the LIRR refused to authorize the test. (Id.)

In March 2001, Rocco went to Glen Cove Hospital because he could not move. (Id. at 50). On that occasion, he was admitted to the Hospital where he stayed for a week from March 8, 2001 to March 15, 2001. (Id.) During that visit, the neurologist ordered a second MRI and plaintiff received an injection to stop the muscle spasms. (Id.)

During the period from April through June 2001, Mr. Rocco testified that he was "frustrated," "hurting," and not coping well emotionally. (Id. at 54-55). He was out of work and his family was forced to sell its house and move to an apartment above Mr. Rocco's father's house. (Id. at 51-52). At some point, Mr. Rocco consulted with Dr. Philip Stone, a psychologist, whom plaintiff had previously seen during the 1990's. (Id. at 55-56).

In May 2001, Dr. Capobianco recommended that plaintiff receive a series of epidural injections to help relieve the pain and reduce the need for pain medication. (Id. at 58). Unfortunately, according to plaintiff, the injections were not only extremely painful, but provided no relief. (Id. at 59). Plaintiff also received physical therapy until September 2001, when he was switched to aquatic therapy treatments, which he received once a week. (Id. at 61-62). He was also given exercises to perform at home. (Id. at 71).[9]

---

[9]Mr. Pantell clarified that on September 29, 2000, he directed Mr. Rocco's exercises "before [plaintiff's thoracic] fractures." (12/11/03 Tr. at 116-17). Mr. Pantell testified that physical therapy would have been discontinued after any acute vertebrae fractures, as were found in plaintiff's CT scans on October 19, 2000. (Id. at 114; 12/12/03 Tr. at 171-72).

In September 2001, Mr. Rocco's leg gave out when he was brushing his teeth and he hit his face against the vanity in the bathroom. (Id. at 66; Pl.'s Ex. 3). He was taken to Glen Cove Hospital where he received thirty stitches. (Id.) At some point, apparently in November 2001, Dr. Capobianco referred plaintiff to another neurologist, Dr. Rubin Lubyov, who prescribed a thermalgesic patch for plaintiff. (Id. at 57-58 (first citing May 2001 as the date of referral, but then seemingly correcting that date to November 2001), 63, 65). Although the patch helped to relieve the pain, it did nothing for the weakness in his leg, and it caused urinary incontinence. (Id. at 65). The patch was extremely strong and Mr. Rocco was told to stop the other oral medications. (Id. at 72).

On November 26, 2001, Mr. Rocco testified that he lost the feeling in both of his feet after he had performed some of the stretching exercises given to him by Mr. Pantell on the deck outside his apartment. (Id. at 72-73). Plaintiff's father and cousin took him to Glen Cove Hospital, where certain neurological testing was performed. (Id. at 73-74). He was then transferred by ambulance to Manhasset Hospital, where the neurosurgeon ordered an MRI, confirming that plaintiff had a disk herniation at T9-T10. (Id. at 74).

On November 27, 2001, the day following the incident on the porch, plaintiff received a letter from the LIRR indicating that they had filmed plaintiff on his deck doing his exercises. (Id. at 76). The LIRR's letter accused plaintiff of dishonesty, fraud, and conduct unbecoming an employee. (Id.) Fred Allen, former union representative for the Transportation Communications Union ("TCU"), testified that as part of his responsibilities, he was tasked with the representation of employees during disciplinary proceedings. (12/10/03 Tr. at 54-55). He testified that in the latter part of 2001, he was asked to represent Mr. Rocco when plaintiff was charged with

dishonesty and with providing false statements to the medical department that contradicted certain surveillance videotapes taken of Rocco. (Id. at 59-60). After reviewing plaintiff's medical records, Mr. Allen negotiated a trial waiver and last chance agreement in which Mr. Rocco agreed to a three month suspension but his employment status was continued, so that if he physically improved he could go back to work and not lose his disability benefits. (Id. at 66-68). Mr. Allen testified that dismissal was possible if plaintiff had chosen to contest the charges and go to arbitration. (Id. at 71).[10]

Following plaintiff's hospitalization on November 26, 2001, the neurosurgeon referred plaintiff to Dr. Noel Perin. (12/9/03 Tr. at 75). Dr. Perin sent plaintiff for an MRI, a CT scan, and for epidural injections. (Id. at 81). Eventually, Dr. Perin recommended surgery on Mr. Rocco's spine. (Id.) Although the spine surgery was initially scheduled for February 2002, pre-operative testing revealed that plaintiff was suffering from three major blocked coronary arteries. (Id. at 82). The spinal surgery was then postponed and heart surgery was performed instead in February 2002. (Id. at 82-83). In June 2002, plaintiff's cardiologist certified that plaintiff was able to return to work. (Id. at 83).

In May 2002, Dr. Perin performed thoracic surgery on plaintiff at St. Luke's Roosevelt Hospital. (Id. at 84). The surgery relieved the pain in plaintiff's thoracic section. (Id. at 85). However, plaintiff still had pain in his lower back and weakness in his extremities. (Id. at 86). Following the surgery, plaintiff remained in Dr. Perin's care through 2002. (Id.) He also

---

[10]Plaintiff testified that he contacted his union representative at the LIRR who told him that if he did not sign a waiver agreement, he would be fired and lose his pension. (12/9/03 Tr. at 77-78). As a result of the waiver he signed, Rocco lost his medical benefits and was put on retirement as of January 2003. (Id. at 79).

continued to receive pain medication, phentanyl, through the thermalgesic patch. (Id. at 86-87, 92).

Based on the doctor's examination and the progression of Mr. Rocco's problems, Dr. Perin sent him for a discongram which demonstrated concordant pain at the L-5 - S-1 level but not at L-4 - L-5. (12/10/03 Tr. at 150-52). Dr. Perin then sent Mr. Rocco for a second opinion from Dr. Lopez, another orthopedic spine surgeon. (Id. at 152; Pl.'s Ex. 24). Dr. Lopez agreed that limited fusion surgery of the lumbar spine "may help his symptoms." (12/10/03 Tr. at 153; Pl.'s Ex. 24). The surgery was performed on May 27, 2003, after which plaintiff remained in the hospital for a week. (12/10/03 Tr. at 154; 12/9/03 Tr. at 91).

Plaintiff testified that gradually, he saw improvement following the fusion surgery. (12/9/03 Tr. at 93). However, he continued to take muscle relaxers, Percocet for the pain, and Valium for anxiety. (Id. at 94). Dr. Capobianco was aware that Dr. Perin had performed a stabilization procedure on plaintiff's lower vertebrae (12/11/03 Tr. at 154), but Dr. Capobianco disagreed with the plaintiff's view that the spinal surgery had been a success, opining that plaintiff showed "[s]ome minor improvement at best." (Id. at 156-57). He was also aware that plaintiff had had the lumbosacral surgery in May 2003. (Id. at 159).

B.  The Experts' Testimony

1) Plaintiff's Witnesses

a) Dr. Capobianco

At trial, plaintiff's treating physician from 1989 to the present, Dr. Capobianco, testified that it was his opinion that the vertebral fractures and other back problems suffered by plaintiff

were related to the August 26, 2000 forklift accident. (12/11/03 Tr. at 127, 164-165). He based his opinion in part on what he understood to be plaintiff's medical history and on plaintiff's representation that the forklift plaintiff had been driving had fallen through a metal plate, causing plaintiff to injure his lower back. (Id. at 127-128).

When asked about prior complaints of back pain, Dr. Capobianco testified that in July 1994, plaintiff had complained of injuring his lower back while lifting a heavy object. (Id. at 128). At that time, he was diagnosed with back strain and prescribed rest only. (Id. at 129). However, Dr. Capobianco was unaware of any other visits by plaintiff to doctors for a back problem prior to the LIRR accident on August 26, 2000. (Id.) The doctor did not know that plaintiff had strained his back approximately one month before the accident and had seen Dr. Demaria. (Id.; Pl.'s Ex. 27). Dr. Demaria's notes indicate that plaintiff was prescribed pain medication for low back pain at that time. (Id. at 130).

When asked whether the fractures in plaintiff's thoracic vertebrae were related to the LIRR accident, Dr. Capobianco explained that although no fractures could be seen on the x-rays taken immediately after the accident, this was probably because the fractures were nondisplaced. (12/12/03 Tr. at 18-19). He did concede that he was not an orthopedic surgeon and he would defer to their expertise. (Id. at 32). He agreed, however, that if plaintiff had fractured vertebrae, he would not have been sent for physical therapy. (Id. at 7).

      b) Dr. Noel Perin

Dr. Noel Perin also testified for plaintiff. Dr. Perin, a specialist in neurological surgery, testified that he first saw Mr. Rocco on January 18, 2002, through a referral from a neurosurgeon on Long Island, Dr. Michael Overby. (12/10/03 Tr. at 128, 131). According to the history

13

provided by plaintiff to Dr. Perin, the doctor understood that Mr. Rocco's forklift had fallen several feet into a ditch. (Id. at 132-33). Plaintiff also told Dr. Perin that following the accident, he had experienced severe pain in his lower and mid back, especially a girdling type pain around his lower thoracic spine. (Id. at 132). Plaintiff told Dr. Perin that, at times, it felt like he was having a heart attack. (Id.) Plaintiff also complained of shooting pains and weakness in his legs. (Id.)

Dr. Perin testified that he had reviewed the plaintiff's various medical records and diagnostic films and that he was aware of the diagnosis of muscle strain, as well as evidence of degenerative changes in plaintiff's lumbar spine. (Id. at 133). The doctor conceded that the degenerative changes are part of the aging process that everyone experiences. (Id. at 134). He also noted a disk herniation at T-9-10 in the thoracic spine that he opined would have an affect on the lower part of plaintiff's body. (Id. at 135, 137-38). The doctor also differentiated the herniated disk from the compression fractures at T-11, T-12 and L-1, explaining how a compression fracture could occur. (Id. at 138). He testified that a compression fracture would occur when there was axial, or straight-down, motion on the spine; he did not think these fractures could have occurred when Mr. Rocco allegedly fell over backwards in October 2000. (Id. at 138-39).

According to Dr. Perin, insofar as plaintiff's upper thoracic spine was concerned, the pain abated after the surgery as did the abdominal girdling pain. (Id. at 146). However, the pain in Mr. Rocco's lower back continued to worsen to the point that he became incapacitated. (Id.) Plaintiff was sent for pain management, given cortizone and epidural injections, which worked for a short period of time. (Id. at 146-47).

14

The doctor testified that based on the MRIs, he noted discogenic changes in Mr. Rocco's lumbar spine which produced "segmental instability." (Id. at 149). The doctor opined that "[i]t was too rapid a course from . . . 2000 when he had no symptoms or very little back symptoms to suddenly become progressed to the stage of being segmentally unstable" to be caused by aging alone. (Id. at 150). He further opined that "[g]iven the history, I would think the accident was very likely the cause of accelerated progression of his symptoms." (Id.) He did concede, however, that the thoracic fractures would not accelerate the process. (Id. at 151).

He testified that the thoracic fractures, thoracic problems, lumbar problems, spasms, and weakness in plaintiff's legs "were caused and accelerated by the injuries that [plaintiff] sustained at the time of the accident because seventy-five percent or more of adults at some point in their lives complain of back pain and it's well-known so that he did not have the type of pain to the degree that he had after the events of August 2000." (Id. at 160). The doctor also testified that he thought Mr. Rocco's problems would be permanent. (Id. at 160-61).

On cross-examination, however, the doctor conceded that he never saw any of the x-rays or films taken of plaintiff from August 2000, September 2000, October 2000, or any time in 2001; all Dr. Perin saw were films taken in 2002. (Id. at 163-64). He also indicated that he never saw any of the reports showing that there were no herniated or bulging disks or fractures prior to October 2000. (Id. at 185-86). He did concede, however, that plaintiff had suffered from degenerative disk disease long before the August 26, 2000 incident. (Id. at 165-66).

c) Dr. Philip Stone

Plaintiff also called his treating psychologist, Dr. Philip Stone, who opined that plaintiff had suffered from post-traumatic stress disorder as a result of the accident. (12/11/03 Tr. at 9,

13-14). Dr. Stone testified that he had seen and treated the plaintiff prior to the August 26, 2000 incident, beginning in 1994. (Id. at 4). At the time, Mr. Rocco was suffering from an obsessive compulsive disorder, in which "[h]e needed to be in control of his own life . . . as well as at times people who were very close to him." (Id. at 5). According to the doctor, he saw Mr. Rocco on a weekly basis from 1994 to 1996. (Id.) At that time, Mr. Rocco was taking Prozac, prescribed by Dr. Franklin Laviola, another family physician, which is used to treat depression.[11] (Id. at 6, 23).[12] Dr. Stone testified that he stopped seeing Mr. Rocco in 1996, and while he was not "cured," "his phobic difficulty did diminish tremendously." (Id. at 8). On cross-examination, the doctor conceded that the fees for his services played a role in Mr. Rocco's decision to stop treating in 1996. (Id. at 26, 28).

Mr. Rocco resumed treatment with Dr. Stone in January 2001 after the LIRR accident. (Id. at 9). The doctor diagnosed Mr. Rocco as having "post-traumatic stress disorder, which mean[t] that [plaintiff] could not stop preoccupying himself about the accident." (Id.) The doctor testified that he was aware that Mr. Rocco was on a variety of medications and that he had been a member of Alcoholics Anonymous, although plaintiff had been alcohol free for thirteen years. (Id. at 10-11).

The doctor opined that the post-traumatic stress disorder was causally related to the LIRR accident and that the depression plaintiff was suffering from "involved an extension and an intensification of the depression that he had earlier." (Id. at 14). The doctor also testified that

---

[11]The doctor's testimony as to whether Dr. Laviola was a psychiatrist or a family physician was unclear. (See id. at 42-45).

[12]On cross-examination, Dr. Stone conceded that Mr. Rocco was also taking Valium at the time. (Id. at 22).

16

plaintiff had "suicidal ideation" after the accident which was also something he had not suffered from before. (Id.)

On cross-examination, the doctor admitted that in reaching his diagnosis, he had accepted what Mr. Rocco had told him at face value. (Id. at 39-40). He also conceded that he remembered a conversation with someone from the LIRR but he did not immediately remember that this person was calling because she had observed Mr. Rocco move differently and change his gait when she turned away. (Id. at 56-61; see Def.'s Ex. N). He did recall her questioning whether the doctor thought Mr. Rocco had any malingering tendencies, but the doctor testified that he believed Mr. Rocco was an honest person. (Id. at 60).

2) Defendant's Doctors

a) Dr. William A. Healy

Defendants presented the testimony of Dr. William A. Healy, an orthopedic surgeon, who reviewed plaintiff's medical records and examined Mr. Rocco on two occasions. (12/12/03 Tr. at 111, 113).[13] Dr. Healy testified that if plaintiff had sustained compression fractures of his T-11, T-12, and L-1 vertebrae during the accident, he would not have been able to drive himself first to the LIRR office and then home, because he would have had bleeding and "exquisite back pain," making it impossible to walk. (Id. at 121-22). He testified that based on his review of Dr. Demaria's records, the diagnosis made by Dr. Capobianco on the date of the accident was essentially the same diagnosis as that made by Dr. Demaria several weeks before the accident, on

---

[13]Dr. Healy admitted that he had done work for the LIRR on prior occasions for fifteen to twenty years. (Id. at 113, 151-52).

July 31, 2000. (Id. at 117, 118-19). He also opined that Mr. Rocco's complaints of back pain radiating down the right leg suggested irritation of the sciatic nerve. (Id.)

According to Dr. Healy, the Hospital report from August 29, 2000 is critical because it shows degenerative disk disease and no fractures. (Id. at 123-24; Pl.'s Ex. 2). The September 15, 2000 MRI similarly shows no fractures of the cervical or lumbar spine. (12/12/03 Tr. at 128). The doctor who prepared the MRI report indicated no evidence of disk herniation or bulges, but there were findings of arthritis and disk degeneration at L-5 - S-1. (Id. at 129).

Dr. Healy concluded, based on the x-ray studies, that the fractures were related to Mr. Rocco's fall at home in October 2000 as opposed to the accident of August 26, 2000. (Id. at 131-32). He also testified that the forces that would have occurred during the August 26, 2000 accident were not consistent with causing compression fractures given the drop of only five to six inches. (Id. at 136-37). He testified, "I don't think that is sufficient force to cause three compression fractures." (Id. at 137).

Finally, Dr. Healy testified that from the records and his examination, he believed that Mr. Rocco had a drug dependency. (Id. at 143).[14] In support of this opinion, he cited several other doctors who had opined that plaintiff's complaints were not consistent with his symptoms (see, e.g., Def's. Ex. B) and that he was malingering. (12/12/03 Tr. at 145). He also opined that the two surgeries performed by Dr. Perin were unnecessary. (Id. at 149).

---

[14]Dr. Healy was also concerned about plaintiff's visits to the emergency room for Demerol, noting that if it happened once, he "would think the person was in a lot of pain." (12/12/03 Tr. at 130-31). He testified that if it happened more often, "I would begin to wonder about [the person's] affection for medication . . . ." (Id. at 131).

b) <u>Dr. Michael Melamed</u>

Dr. Michael Melamed, a psychiatrist hired by defendant, testified that he reviewed certain of Mr. Rocco's medical records, performed an examination of plaintiff, and had Dr. Richard Vickers conduct a Minnesota Multiphasic Personality Inventory ("MMPI") test of Mr. Rocco. (12/15/03 Tr. at 22-23). During the examination, Mr. Rocco told Dr. Melamed that he had "driven over a safety plate and the back wheels of the vehicle he drove fell into the hole." (<u>Id.</u> at 26). Mr. Rocco also told the doctor that he "fractured [three of his vertebrae] and sustained spinal cord damage." (<u>Id.</u> at 26). When asked if he had any psychiatric problems prior to the accident, Mr. Rocco told the doctor that he had seen Dr. Stone "for marital problems for one year and everything worked out." (<u>Id.</u> at 28).

Dr. Melamed diagnosed plaintiff as having "a reactive condition, emotional distress based on the pain which was based on the injury," but no post-traumatic stress disorder. (<u>Id.</u> at 33, 45). He felt that there must be "a sufficient trauma" to qualify for such a diagnosis, but that nothing in the documents or in Mr. Rocco's account of the accident seemed to indicate that he had suffered a trauma of sufficient magnitude to generate this disorder. (<u>Id.</u> at 45). He testified that it would have to be very severe, involving a concern about death, loss of limb or "horrible trauma." (<u>Id.</u> at 46-47).

After reviewing additional information, Dr. Melamed testified that he began to "suspect that another diagnosis would also be warranted. . . ." (<u>Id.</u> at 39). The doctor "realized that [Mr. Rocco's] problems were long-standing" and they had been "severe and preexisting long before the accident, probably beginning in early adolescence, [a] problem of a severe anxiety disorder, obsessive compulsive features, other phobia[,] associated physical problems pertaining to anxiety

19

disorders as well as significant personality traits." (Id. at 39-40). The doctor explained that people with the types of problems he thought Mr. Rocco had "would tend to subconsciously exaggerate pain or use it as a license to become imperfect . . . . The focus becomes the pain and the disability." (Id. at 41). He also testified that plaintiff had developed "quite an affinity for medication, certainly narcotics and psychotropics such as Prozac." (Id. at 48). Given Mr. Rocco's history of affinity to alcohol, the doctor testified that this may be a sign of dependency and "an addictive personality." (Id. at 49).

Dr. Melamed testified as well regarding the findings of Dr. Vickers, who administered the MMPI test. Dr. Vicker's diagnosis was dysthymia, which is a low grade depressive disorder, as well as adjustment disorder with mixed anxiety and depressed mood. (Id. at 60-61). Dr. Vickers found that plaintiff had suffered from anxiety and depression throughout his life and that he overstated or exaggerated subjective components of problems. (Id. at 58). He also opined that plaintiff suffered from hypochondriasis and conversion hysteria which leads one to experience symptoms stronger than other people. (Id. at 58). Dr. Vickers did not, however, find Mr. Rocco suffering from a major depressive disorder. (Id. at 59-60).

## DISCUSSION

Plaintiff moves to set aside the jury's verdict in favor of the LIRR and order a new trial on the grounds that the facts adduced at trial clearly established that the plaintiff suffered injury as a result of the forklift accident.

A. <u>Motion for a New Trial - Standards</u>

Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant a new trial "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in courts of the United States." Fed. R. Civ. P. 59(a)(1).[15] The Second Circuit has held that "[a] grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate 'if the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" <u>Farrior v. Waterford Bd. of Educ.</u>, 277 F.3d 633, 634 (2d Cir.) (quoting <u>DLC Mgmt. Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 133 (2d Cir. 1998)), <u>cert. denied</u>, 536 U.S. 958 (2002). Unlike a motion for judgment notwithstanding the verdict, the Court, in determining if the jury's verdict is so "seriously erroneous" as to merit a new trial, "'need not view [the evidence] in the light most favorable to the verdict winner,'" <u>Farrior v. Waterford Bd. of Educ.</u>, 277 F.3d at 634-35 (quoting <u>DLC Mgmt.</u>

---

[15]Although plaintiff cites case law relevant to a motion for judgment notwithstanding the verdict, pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure, (<u>see</u> Plaintiff's Memorandum of Law, filed January 29, 2004 ("Pl.'s Mem.") at 6-7), it appears that what plaintiff is actually seeking is an order setting aside the jury's verdict and ordering a new trial. (<u>Id.</u> at 9); <u>see</u> <u>Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers</u>, 34 F.3d 1148, 1154 (2d Cir. 1994). Under Rule 50(a)(1), judgment notwithstanding the verdict should be granted only when "'(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the moving party].'" <u>Id.</u> at 1154 (quoting <u>Bauer v. Raymark Indus., Inc.</u>, 849 F.2d 790, 792 (2d Cir. 1988) (quoting <u>Mallis v. Bankers Trust Co.</u>, 717 F.2d 683, 688-89 (2d Cir. 1983)); <u>accord</u> <u>Williams v. County of Westchester</u>, 171 F.3d 98, 101 (2d Cir. 1999). Thus, the Court must view the evidence in the light most favorable to the nonmoving party and must deny the motion unless "'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" <u>Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers</u>, 34 F.3d at 1154-55 (quoting <u>Simblest v. Maynard</u>, 427 F.2d 1, 4 (2d Cir. 1970)). Since the standard for evaluating a Rule 50(a)(1) motion is more stringent, this Court has considered plaintiff's motion as one for a new trial pursuant to Rule 59.

Corp. v. Town of Hyde Park, 163 F.3d at 134), but is free to weigh the evidence and the credibility of the witnesses. United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998), cert. denied, 526 U.S. 1130 (1999). On the other hand, the "'jury's verdict . . . should rarely be disturbed,'" Farrior v. Waterford Bd. of Ed., 277 F.3d at 635 (citations omitted), and a new trial granted only when the court is "'convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice.'" Bauer v. Raymark Indus., Inc., 849 F.2d 790, 792 (2d Cir. 1988) (quoting Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987)).

Thus, in considering plaintiff's motion for a new trial under Rule 59 of the Federal Rules of Civil Procedure, the Court must determine whether the jury's verdict is against the weight of the evidence. See Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 540 (1958), overruled on other grounds, Hanna v. Plumer, 380 U.S. 460 (1965).

B. Application

Plaintiff argues that in order to succeed at trial all that he was required to demonstrate was that he sustained an injury during the August 26, 2000 accident. (Pl.'s Mem. at 8).[16] He contends that the evidence clearly showed that immediately after the forklift incident, he "was in obvious distress" and immediately sought medical attention. (Id. at 7-8). Plaintiff argues that the initial examination showed tenderness on palpation of his lower thoracic and lumbar vertebral areas. (Id. at 7). Plaintiff contends that Dr. Capobianco, who saw him only a few hours after the accident, found plaintiff to be suffering from paralumbarsacral spasm and tenderness. (Id. at 4).

---

[16]Citations to "Pl.'s Mem." refer to the Plaintiff's Memorandum of Law, filed January 29, 2004.

22

It is undisputed that plaintiff was prescribed muscle relaxers as well as pain and anti-inflammatory medication, and was sent for a course of physical therapy. (Id. at 7).

Plaintiff contends that the evidence adduced at trial demonstrated that he suffered thoracic vertebral fractures in October 2000 and that "the only likely mechanism for plaintiff's injuries was the type he was subjected to on August 26, 2000, and no other." (Id. at 7). Plaintiff also contends that it is "undisputed that plaintiff sustained psychiatric injury directly referable to the August 26, 2000 accident and its sequella." (Id. at 8). According to plaintiff, "plaintiff's medical experts and defendant's medical experts both testified that at least some of plaintiff's physical, and, indeed, subsequent psychiatric[] findings could be traced to the August 26, 2000 accident." (Id.) Plaintiff argues that this "fact is not undermined by [the] experts' disagreement about the extent to which the accident caused the injuries." (Id.) Accordingly, plaintiff argues that because "'there [is] no fair interpretation of the evidence supporting a verdict for the defendant'" (id. (quoting Darrow v. Lavancha, 564 N.Y.S.2d 861 (1991)), the verdict should be set aside and a new trial ordered.

Plaintiff's recitation of the facts ignores several important issues that the jury could have considered in reaching its verdict. During the course of cross-examination, plaintiff was asked about prior injuries to his back. He testified that "it could be possible" that in 1986, he went to Glen Cove Hospital where lumbosacral x-rays were taken because he "was always very active" and had pain from the gym or from playing touch or tackle football. (12/9/03 Tr. at 109). He admitted that in 1994 he had seen Dr. Sanesi, his family physician at that time, complaining about injury to his lower back, explaining that it was possibly from lifting weights, playing football, running, or "tree trimming." (Id. at 110).

23

He gave inconsistent testimony about his visit to Dr. Demaria several weeks prior to the accident at the LIRR. On direct examination, plaintiff did not mention that he had seen Dr. Demaria several weeks prior to the LIRR accident. On cross-examination, he did admit that three weeks to a month prior to the LIRR accident of August 26, 2000, he had "pulled a muscle" in his back and sought treatment from Dr. Demaria. (Id. at 108-09, 129-30). However, plaintiff's account of the reason for the visit was contradicted by Dr. Demaria's notes, which reflect a diagnosis of a "possible herniated disk" on July 31, 2000, only three weeks before the August 26, 2000 forklift accident. (12/11/03 Tr. at 183; Pl.'s Ex. 27). Plaintiff's testimony was also unclear as to exactly how he had injured his back causing him to consult with Dr. Demaria. Initially at trial, plaintiff testified that he saw Dr. Demaria because he had hurt his back "bouncing over rails," presumably at work. (Tr. at 130). This testimony was consistent with Dr. Demaria's notes for the July 31, 2000 visit which indicate "complains low back pain brought on by activity to back during work." (Pl.'s Ex. 27; see also 12/11/03 Tr. at 182-83).

However, during his deposition prior to trial, plaintiff testified that he had gone to see Dr. Demaria when he had injured his back "'playing softball and I slid.'" (12/9/03 Tr. at 130). When asked about his deposition testimony at trial, plaintiff did not recall giving that answer, explaining that he was "too busy" that summer to play softball. (Id. at 128). He later contradicted that testimony by stating that he "always played softball." (Id. at 131). He then testified that his memory had been refreshed and he recalled playing in a charity softball tournament and that he saw Dr. Demaria after sliding into base. (Id. at 132-33).

Although plaintiff testified that he had only suffered a "pulled muscle" in July, Dr. Demaria's notes indicate a much more serious condition. Dr. Demaria's notes indicate that he

performed a straight leg raising test that was found to be positive, and that plaintiff was complaining of lower back pain radiating down his right leg. (Id. at 116-17). Mr. Rocco, however, denied that Dr. Demaria had examined him on that occasion, claiming that the doctor was just a "friend of the family." (12/9/03 Tr. at 134). The doctor noted as his impression at the time, "questionable disk." (12/11/03 Tr. at 183). The treatment plaintiff received from Dr. Demaria on July 31, 2000 included Vioxx, as well as a strong narcotic medication, Oxycodone, with APAP or Percocet, as shown on a CVS Pharmacist's Statement. (Def.'s Ex. D, Part 2). On cross-examination, Mr. Rocco admitted that Dr. Demaria had told him he might have a herniated disk and that the doctor prescribed Vioxx and Oxycodone, a narcotic painkiller for him at the time. (12/9/03 Tr. at 135; see also Def.'s Ex. D, Part 2). The doctor also advised him to stay out of work. (12/9/03 Tr. at 130, 136-37).

Regardless of the cause of the injury in July 2000, it is undisputed that plaintiff never told Dr. Capobianco about this earlier incident. (12/11/03 Tr. at 180). Dr. Capobianco's notes indicate that as part of the history given to him by plaintiff, plaintiff indicated that while he had had back problems years ago, he had not had any problems recently. (Id.) According to Dr. Capobianco, he only learned of plaintiff's earlier back injury when he received Dr. Demaria's chart in 2003. (Id. at 180-81).

Plaintiff also failed to tell Ms. Colasanti, the LIRR's physician's assistant whom he had seen on the day of the accident, that he had suffered a back injury three weeks earlier. Ms. Colasanti's notes indicate that when plaintiff initially saw her immediately after the accident, Mr.

25

Rocco denied any history of prior low back or neck injury. (12/15/03 Tr. at 5).[17] Her notes also indicate that plaintiff was not on any medication at the time (Def.'s Ex. D, Part 1) – a representation later shown to be inaccurate as well.[18] Ms. Colasanti's notes indicate that Mr. Rocco called her the day after the accident to tell her that he had forgotten that he had injured his back a few weeks earlier while doing yard work. (12/15/03 Tr. at 5; Def.'s Ex. D, Part 1). This version of the events leading to the visit with Dr. Demaria was not only inconsistent with plaintiff's statement to Dr. Demaria but with his trial testimony as well. Plaintiff, when questioned, could not recall making that phone call to Ms. Colasanti, but he conceded that it was possible. (12/9/03 Tr. at 139).

Thus, although originally denying any back injury or back pain prior to the August 26, 2000 accident, plaintiff's medical history indicated that he had experienced problems with his back before. His medical history indicated that there was at least one recent incident that caused him to seek treatment from Dr. Demaria on July 31, 2000, and possibly as many as three incidents: (1) sliding into base while playing softball; (2) doing yard work; or (3) bouncing over the rails at work.

The jury also could have considered the discrepancies in the statements plaintiff made with respect to a seat belt. According to Dr. Capobianco, plaintiff told the doctor that he was wearing a belt or some sort of restraining device at the time of the accident. (12/11/03 Tr. at 179;

---

[17]Ms. Colasanti's note reads: "Denies h/o prior LB or neck injury." (Def.'s Ex. D, Part 1).

[18]At the time, plaintiff was on various medications, including the medications prescribed by Dr. Demaria. (See 12/9/03 Tr. at 135). In addition, Dr. Capobianco testified that plaintiff suffered from a long-term history of anxiety for which he had been prescribed Prozac and Valium. (12/11/03 Tr. at 130-32).

12/12/03 Tr. at 3-4). He also told the doctor that "the entire machine fell a few feet into a hole or into a depression. . . ." (12/12/03 Tr. at 3). This information was reflected in Dr. Capobianco's notes, and the doctor confirmed during his testimony that this was information he received from plaintiff. (12/11/03 Tr. at 179; 12/12/03 Tr. at 3-4).[19] However, during the trial, plaintiff's testimony was inconsistent. First, he testified he was wearing a seatbelt, and then he denied that the forklift he was driving that day even had a seatbelt. (12/9/03 Tr. at 149). When shown Dr. Capobianco's notes, plaintiff first stated, "He's telling me to wear a belt for my lower lumbar. He is not talking about the forklift." (Id. at 151). Plaintiff next testified that "I don't know what he was talking about. . . . I think he just assumed that [I was wearing a seat belt]." (Id. at 152).

There were other discrepancies in plaintiff's testimony that could have caused the jury to question his credibility. Not only were there discrepancies in plaintiff's testimony about his prior injuries and the issue of the seatbelt, but his testimony regarding the incident of October 19, 2000 was equally unclear. Initially, plaintiff testified at trial that he was lying on his rug in his living room with the T.E.N.S. machine on when he realized that he was unable to get up off the floor. (12/9/03 Tr. at 38). His story to the staff at the emergency room was that he had fallen, landing on his back and striking his head. (Pl.'s Ex. 6). Although initially on cross-examination, plaintiff maintained his story that he suffered these injuries while lying on the floor (12/9/03 Tr. at 182), when confronted with the hospital record, plaintiff altered his account and agreed that he had fallen. (Id. at 181-83).

---

[19]This was not the only instance in which something plaintiff told Dr. Capobianco later turned out to be untrue. Specifically, the day after the MRIs were taken on September 15, 2000, plaintiff told Dr. Capobianco that the MRI showed a herniated lumbosacral disk. (Id. at 39). The doctor, who had not received the radiologist's report at the time of plaintiff's visit, testified that in fact the MRI was negative. (Id.)

This discrepancy is an important one because as a result of the October 19, 2000 incident, x-rays were taken that showed three fractures in the thoracic spine. (See id. at 185). These fractures were not present in the x-rays taken shortly after the LIRR incident on August 29, 2000. (See Pl.'s Ex. 2). Although the plaintiff attempted to persuade the jury that the LIRR incident was a factor in causing these thoracic fractures, the jury, based on the experts' testimony, could reasonably have concluded otherwise. Both Dr. Perin, plaintiff's surgeon, and defendant's expert, Dr. Healy, testified that if those fractures had been caused by the LIRR incident, the fractures would have appeared on the August 29, 2000 x-rays. (12/10/03 Tr. at 185, 188; 12/12/03 Tr. at 131-32, 139).[20]

Moreover, both doctors testified that a significant axial or vertical drop would have been required to produce fractures of this nature. (12/10/03 Tr. at 181-82; 12/12/03 Tr. at 134-39). Dr. Healy testified that had the plaintiff suffered these fractures in August, it is unlikely that he would have been able to walk, to drive or to participate in physical therapy. (12/12/03 Tr. at 121-22, 127, 132). The jury could have determined, as Dr. Healy testified, that given the five-inch drop of one wheel of the forklift into the hole (see id. at 136-139), and plaintiff's description of the motion of his head forward and backward (12/9/03 Tr. at 9-10), it was unlikely that the minor drop of the forklift had caused these fracture injuries. If the jury chose not to credit plaintiff's testimony at trial, but believed the report of the October fall as reflected in the Hospital record, the jury could have concluded that the fractures were caused by a separate, unrelated incident on

---

[20]Only Dr. Capobianco suggested that the fractures may have been "not displaced" and thus not appear on the initial x-rays. (12/12/03 Tr. at 18-19). However, he conceded that he was not an expert in this area and would defer to the opinions of others who were experts in this area. (Id. at 32).

October 19, 2000. As Dr. Perin testified, a person falling and landing on his buttocks could cause a compression fracture. (12/10/03 Tr. at 183).

Thus, the jury could, based on the evidence, have believed that the thoracic fractures were not caused by the accident at the LIRR.

In addition to the evidence that plaintiff had suffered from previous injuries to his back, the jury could also have considered the objective tests which evidenced a pre-existing degenerative condition in Mr. Rocco's spine. Specifically, the x-rays taken on August 29, 2000, three days after the accident, show disk space narrowing, which all the experts agreed was caused by degenerative disk disease, a long-standing condition that was not caused by the accident. (See 12/10/03 Tr. at 165-66; 12/12/03 Tr. at 31, 114-15, 124-25). Similarly, the MRIs taken on September 15, 2000, confirmed the presence of degenerative disk disease not caused by the accident. (Def.'s Ex. Q). Dr. Leone, the spinal specialist, whom plaintiff consulted in mid-September 2000, diagnosed plaintiff with cervical/lumbar degenerative disk disease. (12/9/03 Tr. at 27-28; 12/12/03 Tr. at 34-35, 50-51; Def.'s Ex. R).

Dr. Healy, who not only reviewed these reports, but examined the x-rays and MRIs, as well as the CT scans, testified that not only were the thoracic fractures not present until the October 2000 x-rays, but there was also no objective evidence of bulging or herniated disks present until 2001 when Mr. Rocco was again admitted to the Hospital. Based on all of this information, the jury could have concluded that plaintiff was suffering from ongoing degenerative disk disease, unrelated to his August 26, 2000 forklift incident, which was causing plaintiff's pain.

29

The jury could also have concluded that the various falls that plaintiff sustained after the October 2000 incident were also unrelated to the LIRR accident, and perhaps related to his heart condition, as defendant argued. Specifically, plaintiff fell six times between October 19, 2000 and November 1, 2001, and was taken to the Hospital on each occasion.[21] After it was discovered that plaintiff needed triple bypass heart surgery and the surgery was performed, there is no record of additional falls by plaintiff. Although plaintiff argued that the falls were related to weakness in plaintiff's leg as a result of the LIRR accident, the jury could have chosen to believe Dr. Healy, who testified there was no correlation between the LIRR incident and the falls.

The jury could have concluded as well that the psychological injuries claimed by plaintiff were not causally related to the LIRR incident. First, the jury could have credited Dr. Melamed's testimony that the nature of the LIRR accident itself was not sufficiently traumatic to warrant Dr. Stone's diagnosis of post-traumatic stress disorder. Furthermore, the jury could have concluded, based on plaintiff's acknowledged history of long-term psychological problems and treatment, that he was simply suffering from long-standing pre-existing psychological problems for which Dr. Stone clearly testified he had not been cured after his last visit in 1996. Although both Dr. Melamed and Dr. Vicker found plaintiff to be suffering from a "pain disorder," these psychiatric experts did not and were not competent to testify as to what caused that pain.

In summary, the jury was charged that in order to award damages, they had to find "by a preponderance of the evidence that the Railroad's negligence played a part, even the slightest, in bringing about plaintiff's injuries." (12/16/03 Tr. at 87). The issue of causation was hotly

---

[21]The records demonstrate that in addition to his fall on October 19, 2000, plaintiff fell on January 30, 2001, June 14, 2001, September 29, 2001, October 28, 2001 and November 1, 2001. (Pl.'s Exs. 7, 13, 15, 16, 17).

contested. Having thoroughly reviewed all the evidence in the case, this Court cannot say that the jury's verdict was seriously erroneous or a miscarriage of justice. Even considering the evidence in the light most favorable to plaintiff, the jury's verdict was not against the weight of the credible evidence.

The Court finds that the jury could reasonably have concluded that plaintiff suffered from degenerative disk disease and that prior to the LIRR incident, he had injured his back in July 2000, aggravating that degenerative condition and causing him sufficient pain that required his visit to Dr. Demaria and a prescription of Oxycodone and Vioxx. Certainly, the experts agreed that degeneration was present and was not caused by the accident. The jury could have chosen to credit the testimony of defendants' experts that plaintiff's injuries were not caused by the accident. Based on the evidence, the jury may very well have concluded that the minimal drop of one wheel of the hi-lo only five to six inches would not have had sufficient force or impact to cause any injury to plaintiff. The evidence was more than substantial to support a conclusion that plaintiff's alleged injuries and pain were all preexisting due to the degenerative disk disease and the incident that caused plaintiff to consult with Dr. Demaria in July 2000.

Moreover, in assessing plaintiff's credibility, the jury could have considered the fact that the plaintiff did not reveal the prior incident to either Dr. Capobianco or to the LIRR. They also could have considered his complaints of pain which seemed to be disproportionate to his objective symptoms as well as his frequent visits to the Hospital for narcotics. Finally, as noted above, the numerous inconsistencies in plaintiff's testimony may have influenced the jury's determination here.

In sum, the jury had sufficient evidence to discount plaintiff's version of events and to conclude that plaintiff was not injured as a result of the LIRR incident. Having heard the trial testimony and observed the demeanor of the witnesses, and recognizing that the jury's determination "should rarely be disturbed," Farrior v. Waterford Bd. of Ed., 277 F.3d at 635, this Court concludes that the jury's verdict was neither a "seriously erroneous result," nor did it result in a miscarriage of justice. Bauer v. Raymark Indus., Inc., 849 F.2d at 792.

Accordingly, for the reasons stated above, this Court denies plaintiff's motion for a new trial.

The Clerk is directed to mail copies of this Order to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
January 20, 2006

Cheryl L. Pollak
United States Magistrate Judge